USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9-6-16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

JENNIFER THOMAS,

                        Plaintiff,

          -v-

ROGER HARRIS,

                        Defendant.

------------------------------------------------------------------X

10 Civ. 4025 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

    Plaintiff Jennifer Thomas brings this action under 42 U.S.C. § 1983, alleging violations of her constitutional rights to privacy under the Fourth and Fourteenth Amendments to the United States Constitution. Thomas alleges that while she was an inpatient at a psychiatric hospital, defendant Roger Harris, who worked as a therapy aid, repeatedly entered the area where Thomas was showering and peered at her naked body, and on one occasion entered Thomas's bedroom and asked to and did look under her clothing.

    Harris now moves for summary judgment on the grounds that the statute of limitations bars Thomas's claims. Thomas opposes the motion on the grounds that there is a material question of fact as to whether the statute of limitations was tolled for reasons of disability due to Thomas's alleged insanity. For the reasons that follow, Harris's motion is granted.

**I.     Background**

      **A.     Facts**[1]

            **1.     Alleged Incidents and Investigation**

Thomas has a long history of mental illness and psychiatric hospitalizations. Joint 56.1 ¶ 2.[2] On February 15, 2007, she was admitted as an inpatient to Rockland Psychiatric Center ("RPC"), a hospital within the New York State Office of Mental Health ("OMH"). *Id.* ¶¶ 3–4. On April 17, 2007, Thomas, with her consent, was transferred to the Clinical Research and Evaluation Facility ("CREF") unit at the Nathan S. Kline Institute ("NKI"), a research facility on the RPC grounds. *Id.* ¶¶ 5–10.

Harris is a therapy aid at the CREF unit, who worked overnight and was responsible for monitoring the patients and making sure that they woke up at a certain time. *Id.* ¶¶ 12–13. Thomas alleges that on or about April 25, 2007, while she was undressed and taking a shower, Harris entered the bathroom, deliberately pulled open the curtain, looked at Thomas's naked

---

[1] The following facts are drawn primarily from the undisputed facts contained in the parties' Joint Rule 56.1 Statement, Dkt. 56 ("Joint 56.1"), as well as other undisputed facts and disputed facts contained in the parties' Rule 56.1 Statements, Dkt. 58 ("Harris 56.1"); Dkt. 66-1, ¶ 76 ("Thomas 56.1"). Citations to the Rule 56.1 statements incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[2] The parties' experts dispute Thomas's proper diagnosis. Harris's expert contends that Thomas's diagnosis is Schizoaffective Disorder, Bipolar Type, Harris 56.1 ¶ 3, and Thomas's expert contends that Thomas also should have been diagnosed with Post-Traumatic Stress Disorder, Dkt. 66-1 ("Response to Harris 56.1"), ¶ 3.

body, and said "oops," and repeated this conduct every day that he worked in late April and early May—13 occasions in total (April 25, 26, 29, 30, and May 1, 2, 3, 6, 7, 8, 9, 10, 13). *Id.* ¶¶ 14–15. Thomas also alleges that on one occasion during this period, Harris entered her bedroom and asked if Thomas had kids and if she had had a C-section; although Thomas responded that she had had a normal delivery, Harris allegedly asked to see her scar and Thomas lifted her shirt, opened her pants button and unzipped her pants "a pinch." *Id.* ¶¶ 16–18. Thomas does not allege that Harris touched her at any time. *Id.* ¶ 19.

Thomas did not seek treatment as a result of these incidents. *Id.* ¶ 20. Thomas did report the incidents to a staff member at the CREF unit, and to her doctor. Harris 56.1 ¶¶ 26–27.[3] Vera Hill, a clinical risk management specialist at RPC, investigated Thomas's allegations, including by interviewing Thomas on May 14, 2007. Joint 56.1 ¶¶ 21–22. During this interview, Thomas gave "a coherent and detailed account of these incidents," and did not say or do anything that caused Hill to think that Thomas was unable to understand or communicate effectively. *Id.* ¶¶ 24, 27. Hill asked questions, and Thomas gave answers which Hill understood and wrote down; Hill wrote a statement detailing Thomas's allegations which Thomas reviewed and signed. *Id.* ¶¶ 25–26, 28–29. On May 24, 2007, Thomas was transferred out of the CREF unit and back to RPC, because she wanted to be discharged, not because of the alleged incidents involving Harris. *Id.* ¶¶ 30–31.

### 2. Facts Related to Thomas's Mental Capacity Before, During, and After the Alleged Incidents

Because the primary issue on this motion is the availability of an insanity toll to the statute of limitations, the Court here reviews additional facts relevant to that determination.

---

[3] Thomas disputes the characterization of these discussions with staff and her doctor as "reports," a point the Court addresses in its analysis below.

These include facts which pertain to court and administrative proceedings separate from the present action.

Prior to the alleged incidents, Thomas signed various consent forms. On April 11, 2007, she signed an eight-page form consenting to participate in a vitamin intervention study at NKI, and on that same day, she signed a seven-page form consenting to be transferred to the CREF unit and to use clinical information for research purposes. *Id.* ¶¶ 7–8. On both forms, Thomas's capacity to consent was attested to by two people. *Id.* ¶ 9. On May 8, 2007, Thomas also signed an eight-page consent form to participate in a research study concerning the neurophysiology of violence in schizophrenia. *Id.* ¶ 11. Two people also attested to Thomas's capacity to consent to this form. Harris 56.1 ¶ 13.[4]

While Thomas was at the CREF unit between April 17 and May 24, 2007, she was able to bathe and dress herself, read, and use a computer. Joint 56.1 ¶¶ 32–34. She was also able to make requests, such as to call her mother or sister by telephone. *Id.* ¶ 35.

In June 2007, Thomas wrote notes asking to see a lawyer so that she could sue Harris. *Id.* ¶ 36. By October 3, 2007, Thomas retained Aaron David Frishberg, her counsel in this action, as part of her effort to be discharged from the RPC and to sue Harris; Frishberg has represented Thomas continuously since then. *Id.* ¶¶ 37–38. As part of her efforts to be discharged from RPC, Thomas asked Frishberg to obtain documents from RPC to show a judge that she had made progress, testified in court on her own behalf, and signed a release (dated December 11, 2007) authorizing Frishberg to obtain her medical records. *Id.* ¶¶ 39–41.

---

[4] Although Thomas challenges the weight to be attached to the attestation on the grounds that the individuals did not recite any data on these forms to support their conclusions, she does not dispute that they attested to her capacity to consent. *See* Harris 56.1 ¶ 13; Response to Harris 56.1 ¶ 13.

In 2007, Thomas had a court hearing in connection with RPC's effort to medicate her over her objection, at which she testified and Frishberg represented her. *Id.* ¶¶ 42–44.

In July 2007, Thomas testified at a hearing concerning her eligibility for food stamps. *Id.* ¶ 45. She succeeded in restoring her eligibility. *Id.* ¶ 47.

In 2008, Thomas had a court hearing about whether she should be placed on assisted outpatient treatment, at which she was represented by an attorney from the Mental Hygiene Legal Service. *Id.* ¶¶ 48–50.

In 2008, Thomas filed a claim on her own behalf with the New York Court of Claims. The claim concerned allegations that RPC had improperly used money belonging to her for maintenance at RPC. Without the aid of an attorney, Thomas contacted the Court of Claims to ask how to file a claim, and after receiving a form, she filled it out, got it notarized, and filed it with the Court of Claims. *Id.* ¶¶ 51–57.

In 2008, Thomas represented herself at a custody hearing in court, and informed the court that she would like to have her mother involved in her children's care and custody. *Id.* ¶¶ 59–60.

**B.     Procedural History**

On May 14, 2010, Thomas filed the Complaint. Dkt. 2 ("Compl."). On June 2, 2010, the case was referred to Magistrate Judge Maas for general pretrial supervision. Dkt. 3. On December 20, 2010, Harris answered. Dkt. 9. On October 7, 2011, the case was reassigned from Judge Jones to this Court. Dkt. 16.

Discovery in this case was severely hampered because, *inter alia*, Thomas could not be located at various times, or was unavailable to participate in a deposition or examination by a forensic psychiatrist due to her status as a psychiatric inpatient. The case was placed on the suspense calendar between March 12, 2012 and July 26, 2013. *See* Dkts. 22, 24. Discovery continued to be delayed after the case was first removed from the suspense calendar due to

5

Thomas's unavailability or inability to participate; on August 29, 2013, the case was returned to the suspense calendar.[5] After numerous extensions of the fact and expert discovery deadlines, on January 20, 2016, this Court held a pre-motion conference regarding Harris's anticipated motion for summary judgment. On February 12, 2016, the parties filed a Joint Rule 56.1 Statement. Dkt. 56. On February 19, 2016, Harris moved for summary judgment, Dkt. 57, along with a Rule 56.1 Statement of Defendant Roger Harris, Dkt. 58, a memorandum of law, Dkt. 59 ("Harris Br."), a declaration of Virginia Harvey, Dkt. 60 ("Harvey Decl."), with exhibits attached, and a declaration of his counsel, Michael E. Peeples, Dkt. 61 ("Peeples Decl."), with exhibits attached.

On March 18, 2016, Thomas filed a brief in opposition, Dkt. 69 ("Thomas Br."),[6] a response to Harris's Rule 56.1 Statement, Dkt. 66-1, ¶¶ 1–75, a Rule 56.1 Statement on behalf of Thomas, Dkt. 66-1, ¶ 76,[7] a declaration of Thomas's counsel, Aaron David Frishberg, Dkt. 64 ("Frishberg Decl."), with exhibits attached, Dkts. 64-1, 65-1, 67-1 to 67-3, 68-1,[8] and two

---

[5] Due to an administrative oversight, the case was never removed from the suspense calendar once fact discovery was completed.

[6] Thomas's counsel filed the opposition brief twice on the same day, Dkts. 62, 69, the second version of which contains a table of contents and table of authorities, but appears otherwise identical. References to the page numbers of Thomas's opposition brief refer to the ECF page numbers from docket number 69.

[7] Thomas's 56.1 Statement was confusingly titled "Rule 56.1 Statement of Defendant of Plaintiff." After attempts to have Thomas's counsel re-file his submissions in a clearer form failed, the Court accepted docket number 66-1 as both Thomas's Response to Harris's Rule 56.1 Statement, and paragraph 76 of that document as Thomas's own Rule 56.1 Statement. *See* Dkt. 77.

[8] Due to electronic filing difficulties, Thomas's counsel filed multiple versions of his declaration so as to permit him to attach all of the exhibits. Although the docketing staff rejected the filings as deficient, the Court has considered all of the submissions.

submissions from Thomas's forensic psychiatrist, Dr. Stephen S. Teich, M.D., Dkts. 63 ("Teich Report," dated May 28, 2015),[9] 66 ("Teich Supp. Report," dated March 7, 2016).

On March 30, 2016, Harris filed a reply brief, Dkt. 71 ("Harris Reply Br."), and a reply declaration of his counsel, Michael E. Peeples, Dkt. 70 ("Peeples Reply Decl."), with exhibits attached. On July 8, 2016, with leave of court, Harris filed a response to Thomas's Rule 56.1 Statement. Dkt. 78.

## II.     Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is

---

[9] Dr. Teich's May 28, 2015 report was also attached as an exhibit to docket number 68. Neither copy of the "Psychiatric Report" was signed by Dr. Teich.

sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

**III.   Discussion**

    **A.   Statute of Limitations**

"In section 1983 actions, the applicable limitations period is found in the 'general or residual [state] statute [of limitations] for personal injury actions.'" *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (alterations in original) (quoting *Owens v. Okure*, 488 U.S. 235, 249–50 (1989)).  For claims arising in New York State, that limitations period is three years. *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013); *see also* N.Y. C.P.L.R. § 214(5) (McKinney).  "When the applicable limitations period is measured in years, the anniversary date of the date of accrual is the last day for instituting action." *Day v. Morgenthau*, 909 F.2d 75, 79 (2d Cir. 1990), *as amended on reh'g* (Aug. 29, 1990) (alterations, internal quotation marks, and citations omitted).  "Federal law determines when a section 1983 cause of action accrues, and [such] accrual occurs when the plaintiff knows or has reason to know of the injury which is the basis of [the] action." *Pearl*, 296 F.3d at 80 (internal quotation marks and citations omitted).

Here, the final incident in which Thomas alleges that Harris invaded her privacy took place on May 13, 2007.  Joint 56.1 ¶¶ 14–15, 61.  Because Thomas knew of each alleged incident at the time it occurred, her claim based on that incident accrued on May 13, 2007, and thus, the limitations period expired on May 13, 2010.[10]  However, the Complaint was not filed until May 14, 2010.  Dkt. 2; Joint 56.1 ¶ 62.  A claim filed even one day after the limitations period is barred.  *See Day*, 909 F.2d at 79.  Thomas does not dispute that the Complaint would

---

[10] The statute of limitations for Thomas's claims based on the earlier incidents expired on the three-year anniversary of those incidents.  The Court here focuses only on the latest-in-time incident to determine if Harris has *any* claims not barred by the statute of limitations.

8

ordinarily be deemed untimely, but argues that the statute of limitations was tolled.  *See* Thomas Br. 5; Compl. ¶ 18.

### B.     Insanity Toll

#### 1.     Legal Standard

Federal courts borrow state law to determine whether the statute of limitations for a § 1983 action should be tolled, unless the state's tolling rules would defeat the goals of the federal statute.  *Pearl*, 296 F.3d at 80 (citing *Board of Regents v. Tomanio*, 446 U.S. 478, 484–86 (1980), and *Hardin v. Straub*, 490 U.S. 536, 539 (1989)).  Under New York law, a statute of limitations may be tolled for "insanity," a practice which courts have held does not defeat the goals of § 1983.  *Inesti v. Hogan*, No. 11 Civ. 2596 (PAC), 2013 WL 5677046, at *5 (S.D.N.Y. Sept. 30, 2013) (citing *Shonowsky v. City of Norwich*, No. 10 Civ. 0745, 2011 WL 4344028, at *3 (N.D.N.Y. Apr. 18, 2011)).

If a would-be plaintiff "is under a disability because of . . . insanity at the time the cause of action accrues," where the statute of limitations is three years or longer, "the time within which the action must be commenced shall be extended to three years after the disability ceases." N.Y. C.P.L.R. § 208 (McKinney).  The New York Court of Appeals has directed that the insanity toll be "narrowly interpreted," and apply "to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society."  *McCarthy v. Volkswagen of Am., Inc.*, 55 N.Y.2d 543, 548 (1982); *see also Smith v. Smith*, 830 F.2d 11, 12 (2d Cir. 1987) (citing *McCarthy*).

Having a mental illness is not, by itself, sufficient to qualify for the insanity toll. *McCarthy*, 55 N.Y.2d at 548 (noting that legislative history shows that the proposition of substituting the phrase "mental illness" for "insanity" was rejected); *Swartz v. Berkshire Life Ins. Co.*, No. 99 Civ. 9462 (JGK), 2000 WL 1448627, at *4 (S.D.N.Y. Sept. 28, 2000).  Rather, the

9

disability must be of a "severe and incapacitating nature." *Dumas v. Agency for Child Dev.-N.Y.C. Head Start*, 569 F. Supp. 831, 833 (S.D.N.Y. 1983). "[S]tate courts have consistently found that a very high level of incapacity must be demonstrated before a plaintiff may successfully invoke Section 208." *Keitt v. City of New York*, No. 09 Civ. 5663 (PKC) (DF), 2010 WL 3466175, at *7 (S.D.N.Y. Aug. 9, 2010), *report and recommendation adopted*, 2010 WL 3466079 (S.D.N.Y. Sept. 2, 2010); *see also Estate of Mandarino v. Mandarino*, 699 F. Supp. 2d 646, 654 (S.D.N.Y. 2010) (citing New York cases in which toll applied to a plaintiff who was "unresponsive," a plaintiff who "suffered from brain injuries, which . . . [required] the appointment of a guardian ad litem," and a plaintiff who "suffered a stroke . . . and could not communicate his wants, needs, and feelings" (internal quotation marks and citations omitted)), *aff'd*, 408 F. App'x 428 (2d Cir. 2011) (summary order).

The plaintiff "bears the burden of proof on the question of whether a limitations period should be tolled." *Keitt*, 2010 WL 3466175, at *7; *Swartz*, 2000 WL 1448627, at *5. "Although the condition of an individual's mental capabilities is largely a factual question," courts can determine that the insanity toll is unavailable as a matter of law and need not conduct a fact-finding hearing. *McCarthy*, 55 N.Y.2d at 548 (claimed toll "untenable" as a matter of law where plaintiff could function in society but alleged that "post traumatic neurosis" prevented him from confronting the memory of the accident at the center of the claim (internal quotation marks omitted)); *see Eisenbach v. Metro. Transp. Auth.*, 62 N.Y.2d 973, 974–75 (1984) (affirming dismissal of untimely claims as a matter of law where plaintiff invoked the insanity toll because he was "generally confused, disoriented, and unable to effectively attend to [his] affairs" as a result of pain medication administered following an accident (internal quotation marks omitted)); *Smith*, 830 F.2d at 12 (affirming summary judgment for defendant where plaintiff unsuccessfully

10

pursued toll based on post-traumatic stress disorder); *de los Santos v. Fingerson*, No. 97 Civ. 3972 (MBM), 1998 WL 740851, at *5 (S.D.N.Y. Oct. 23, 1998) (rejecting plaintiff's argument that court could not decide insanity as a matter of law and was required to hold a fact-finding hearing, and dismissing claims as untimely because claimed disabilities were categorically insufficient and plaintiff's conduct in obtaining his medical appointments and pursuing workers' compensation claims precluded application of the toll).

### 2. Application

The record evidence demonstrates that during the relevant period, Thomas was not insane for the purposes of the statute of limitations toll. The opinion offered by Thomas's expert does not create a material issue of fact with respect to the toll because it is based on premises that are unavailing as a matter of law and is contrary to the record evidence.[11]

---

[11] Thomas makes two preliminary arguments regarding the record evidence. First, she seeks to reopen discovery on the grounds that Harris did not identify Virginia Harvey—a nurse at the CREF unit who submitted a declaration in support of Harris's summary judgment motion—in Harris's initial disclosures under Federal Rule of Civil Procedure 26(a) as a witness likely to have discoverable information, and that Harris did not produce the documents attached to Harvey's declaration during discovery. Thomas Br. 7–8. However, in his reply declaration, Harris's counsel, Peeples, avers that he listed Harvey in the initial disclosures, which were mailed on May 13, 2011, and that he produced the documents attached to Harvey's declaration during discovery on October 28, 2011 and December 9, 2011. Peeples Reply Decl. ¶¶ 2–6. The record evidence validates Peeples' representation as to the initial disclosures and the production of the attached documents, which are identified by bates stamp in Peeples' discovery production cover letters. Peeples Reply Decl., Exs. A–C; *see* Harvey Decl., Exs. A–B. Thomas's request to reopen discovery is, therefore, denied. Second, Thomas argues that the documents attached to the Harvey Declaration—census monitoring sheets and shift-to-shift reports from the CREF unit—are inadmissible hearsay. Thomas Br. 9–10. The Court finds that the Harvey Declaration provides a sufficient foundation to support that these documents fall within the hearsay exception for records of a regularly conducted activity. *See* Harvey Decl. ¶¶ 4–6; Fed. R. Evid. 803(6); *see Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 289 (2d Cir. 2010) (first-hand source of information in the record need not be identified). For avoidance of doubt, even if the Court had not considered these documents, the resolution of Harris's summary judgment motion would be the same.

11

The record is replete with evidence that, under the standards guiding application of the tolling statute, Thomas was not insane during the period before, during, or after the alleged incidents. Most importantly, Thomas demonstrated her ability to protect her legal interests by reporting the alleged incidents with Harris. She first told a staff member at CREF of the incidents without being prompted; then, after the staff member summoned her doctor, told her doctor, Dr. Roy; and then, told a risk management specialist, Vera Hill. Harris 56.1 ¶ 26; *see also* Peeples Decl., Ex. A ("Thomas Tr."), at 64; *id.*, Ex. E, at 37 (Thomas signed statement to Hill indicating that it was in the course of a conversation that she first informed CREF staff about Harris entering the bathroom while she showered); Dkt. 64-1 ("Kerr Tr."), at 13. Thomas made these reports on May 14, 2007. Thomas Tr. 65; Peeples Decl., Ex. B ("Hill Tr."), 30–31. At the time she was interviewed by Hill, Thomas understood and responded to questions, and gave coherent and detailed answers. Joint 56.1 ¶¶ 24–29; *see also* Peeples Decl. Ex. E, at 33–37 (Thomas statement). These actions, in extremely close proximity to the incidents in question, are strong evidence that Thomas was not insane at the time she gave these reports. *See, e.g.*, *Inesti*, 2013 WL 5677046, at *1, *5–6 (denying insanity toll and granting summary judgment without evidentiary hearing where record demonstrated that plaintiff, although diagnosed with schizoaffective one disorder and admitted to psychiatric facilities, had wherewithal to file complaints to the medical staff during the relevant period); *Keitt*, 2010 WL 3466175, at *8 (granting motion to dismiss without evidentiary hearing, noting plaintiff "had no difficulty remembering what happened to him and explaining his injuries"); *Mulkern v. N.Y. State Police*, No. 08 Civ. 8870 (HB) (LMS), 2010 WL 5584598, at *5, *10 (S.D.N.Y. Dec. 8, 2010) (plaintiff's testimony at administrative hearings was "coherent and lucid and demonstrated an understanding of the nature of the proceedings," supporting denial of insanity toll following

evidentiary hearing), *report and recommendation adopted*, 2011 WL 135001 (S.D.N.Y. Jan. 13, 2011).

Besides Thomas's report as to the alleged incidents with Harris, the record also demonstrates Thomas's ability to make complaints and advocate for her own interests in various contexts in the period following these alleged incidents. On May 24, 2007, motivated by a desire to be discharged, Thomas successfully requested to transfer out of the CREF unit and NKI and returned to RPC, ceasing to participate in research studies. Joint 56.1 ¶¶ 30–31. The following month, in June 2007, Thomas made a written request to speak with an attorney both for the purpose of obtaining her discharge and to sue Harris. As a result, she retained Frishberg, her attorney in this action, by October 3, 2007, worked with him during the year to obtain documents and records in furtherance of her attempt to be discharged, and testified at a hearing at which he represented her. Joint 56.1 ¶¶ 36–44. In July 2007, she successfully petitioned and testified at a hearing to reinstate her food stamps. Joint 56.1 ¶¶ 45–47. In 2008, she also filed, on her own, a claim with the Court of Claims, had a court hearing regarding her placement at an assisted outpatient facility at which she was represented by legal service counsel, and participated in a custody hearing. Joint 56.1 ¶¶ 51–58. Each of these engagements demonstrates that in the weeks, months, and year following the alleged incidents, Thomas was capable of advocating for her legal interests, thus disqualifying her from the insanity toll. *See Mulkern*, 2010 WL 5584598, at *5, *10 ("An ability to advance and protect one's legal interests negates a claim of entitlement to [ ] tolling under CPLR § 208.") (citing plaintiff's attendance at hearings for workers' compensation claims and applications for social security disability insurance benefits and supplemental security income); *see also, e.g.*, *Inesti*, 2013 WL 5677046, at *6 (complaints effective at obtaining transfer); *Reyes v. City of New York*, No. 00 Civ. 1050 (NRB), 2000 WL

13

1505983, at *3, *6 (S.D.N.Y. Oct. 6, 2000) (plaintiff "pursued several legal avenues, obtaining legal representation and displaying a consistent ability to advance his own legal interests in a variety of fora," rendering him ineligible for insanity toll); *de los Santos*,1998 WL 740851, at *5 (plaintiff's pursuit of rights before Worker's Compensation Board supported denial of § 208 toll).

The record evidence also shows that Thomas was not insane during the time immediately preceding and during the period covered by the alleged incidents. On April 11, 2007, Thomas signed two consent forms, one to participate in a vitamin intervention study, and another to be admitted to the CREF unit and to use her clinical information for research purposes. Joint 56.1 ¶¶ 8–9. Then, on May 8, 2007, she signed a third consent form to participate in a study on neurophysiology of violence in schizophrenia. *Id.* ¶ 11. For each of these forms, her capacity to consent was attested to by two individuals, one of whom was a psychiatrist who attested that he or she "examined" Thomas to determine whether she was "capable of understanding the purpose, nature, risks, benefits and alternatives (including non-participation) of the research, [and] making a decision about participation." Peeples Decl., Ex. E at 18, 30, 46; *see also* Harvey Decl. ¶ 2 (describing the consent and evaluation process).[12]

Finally, the record evidence establishes Thomas's general ability to function during the relevant period. Throughout her time at the CREF unit, Thomas was able to clothe and bathe herself, read, use a computer, and make requests, such as making telephone calls to her mother and sister. Joint 56.1 ¶¶ 32–35; Harvey Decl. ¶ 3. Thomas's level of functionality falls far short

---

[12] Although Thomas challenges these attestations on the grounds that the forms do not explain the factual basis on which the psychiatrists formed their opinion, Response to Harris 56.1 ¶ 13, the attestations by four different people, viewed in combination, are strongly probative. *See* Peeples Decl., Ex. E at 17–18, 29–30, 45–46.

of the "severe and incapacitating nature [of the disability] contemplated by the tolling statute." *Dumas*, 569 F. Supp. at 833.

Thomas's attempt to raise an issue of fact regarding her eligibility for the insanity toll fails. Thomas relies exclusively on the opinion of her expert, Dr. Teich, to argue that the toll should apply. Thomas also contests the record evidence reviewed above in a number of ways, arguing that the question of her insanity should be left to the finder of fact, and emphasizing that even a single day's toll on May 13, 2007 would make her Complaint timely. Thomas Br. 14–17.[13] But however close Thomas came to bringing a timely claim as to the last of the alleged incidents, her arguments, and Dr. Teich's opinion on which they rely, are contrary to law and inconsistent with the factual record.[14]

Dr. Teich examined Thomas on May 13, 2015 for approximately four hours. Teich Report at 1. He also reviewed her psychiatric records from Rockland State Hospital, Stony Ridge Lodge, Mt. Vernon Hospital, and New York Hospital, Cornell Division – Westchester, *id.*,

---

[13] Harris does not contest Thomas's theory that a single day of insanity on May 13, 2007 would qualify for a toll on that day. The Court analyzes Harris's summary judgment motion assuming that Thomas's theory is viable. However, the Court notes that, although the concept of a single-day toll is not precluded by the language of C.P.L.R. § 208 (requiring that the insanity be present at the time the claim accrues), where a claim of mental disability is concerned, ordinarily a more sustained period of insanity is shown. *See Dumas*, 569 F. Supp. at 832–33 ("[T]he plaintiff must show that the disability was continuous during the period in question; a 'lucid [interval] of significant duration' ends the toll." (quoting *Graboi v. Kibel*, 432 F. Supp. 572, 579 (S.D.N.Y. 1977)). In any event, the Court's conclusion is that Thomas has not raised a question of fact for a claim of either sustained or one-day insanity during the period ending May 13, 2007.

[14] Because the Court, having considered the opinion of Dr. Teich, holds that it is insufficient to raise a question of fact, the Court has no occasion to reach Harris's separate argument that Dr. Teich's reports should be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), on the grounds that, to the extent Dr. Teich offers an opinion, it is *ipse dixit*, lacking a foundation in facts and data. Harris Reply Br. 4–6.

as well as the census monitoring sheets and shift-to-shift reports from the CREF unit, Teich Supp. Report at 1; *see* Harvey Decl., Exs. A–B.

Dr. Teich opines that during the relevant period, the records give "no indication that [Thomas] was actively able to pursue in any direct or rationally motivated or stated way a resolution to her distress. . . . [M]y opinion [is] that she was unable to rationally pursue her behavioral and emotional needs, and certainly had no ability to recognize and pursue the more sophisticated and complex legal needs that she had." Teich Supp. Report at 3. Dr. Teich's conclusion, however, is uniformly refuted by the record evidence, and is further undermined by his application of a standard of insanity that is more permissive than that governing insanity tolls.

Dr. Teich relies on his conclusion that Thomas could not "actively" pursue her needs, and only "passive[ly]" reported the alleged incidents with Harris. *Id.*; Teich Report at 2;[15] Peeples Reply Decl., Ex. D ("Teich Tr."), at 135–36; *see* Thomas Br. 14–15. That argument is contrary to the facts and, even if true, lacks legal import. As a matter of fact, although Thomas did not initiate the conversations with Dr. Roy or Hill, she raised the alleged incidents involving Harris with a staff member unsolicited. Peeples Decl., Ex. E at 37; Thomas Tr. 65. It was thus Thomas's initiative that began the whole process. As a matter of law, even if Thomas were able to make her needs and complaints known only when prompted, or lacked motivation to follow through on her needs or wants, a deficiency of initiative-taking is not sufficient for an insanity toll. *See Wenzel v. Nassau Cty. Police Dep't*, No. 93 Civ. 4888, 1995 WL 836056, at *4 (E.D.N.Y. Aug. 5, 1995) ("[A]pathy, depression, posttraumatic neurosis, psychological trauma

---

[15] Although Dr. Teich's supplemental report recites various entries from the census monitoring sheets and shift-to-shift reports immediately before stating his opinion, he does not explain how these entries—which generally describe Thomas exhibiting various degrees of social and unsocial behavior, talkativeness, agitation, anger, aggression, and discontent—support his conclusion.

16

and repression therefrom, or mental illness alone have been held to be insufficient to invoke the tolling provisions of CPLR § 208."); *Sanders v. Rosen*, 605 N.Y.S.2d 805, 814 (Sup. Ct. N.Y. County 1993) (same); *see also Swartz*, 2000 WL 1448627, at *5 ("Difficulty in functioning is not sufficient to establish insanity for the purposes of § 208.").

Dr. Teich also bases his conclusion that Thomas had an overall inability to function in society that left her unable to protect her legal interests on the facts that she was admitted as an inpatient in a psychiatric facility, and that the Post-Traumatic Stress Disorder ("PTSD") with which Dr. Teich diagnosed her as having had not previously been recognized or treated. *See* Teich Report at 2 (reciting opinion that doctors failed to include PTSD as a diagnosis as a result of sexual abuse in her teens); Teich Tr. 134–38 ("Q: Are you able to say to a reasonable degree of medical certainty that on a particular day, namely, May 13, 2007, eight years ago, Jennifer Thomas was unable to protect her legal rights? A: On that day for a substantial period around, I mean, you know. She was in psychiatric hospitals. . . . She certainly wasn't able to get herself out of the hospital." *Id.* at 137.). *McCarthy*, however, forecloses this measure of dysfunction as the test for insanity, as it holds that merely having a mental illness itself does not cause the insanity toll to apply, and that post-traumatic neurosis too is insufficient. 55 N.Y.2d at 548–49; *see also Smith*, 830 F.2d at 12; *de los Santos*, 1998 WL 740851, at *2, *4. And courts have held that the insanity toll does not apply even to plaintiffs who are admitted to psychiatric facilities. *See Inesti*, 2013 WL 5677046 at *1, *5–6; *cf. Mulkern*, 2010 WL 5584598, at *4 (plaintiff not eligible for toll despite recieving in-patient treatment from various facilities for "debilitating alcoholism").

Indeed, Dr. Teich's opinion in his initial report, if credited, reinforces that Thomas is *not* eligible for the insanity toll. Dr. Teich opines that Thomas's psychiatric symptoms deteriorated

17

after the alleged incidents with Harris.  Teich Report at 2 (incidents "have significantly exacerbated Ms. Thomas's illness and symptoms"); *see also* Kerr Tr. 15 (Thomas was "always agitated," but "became a bit more" in the two to three days after she reported the alleged incidents).  Dr. Teich's opinion therefore implies that Thomas's psychiatric condition was stronger before May 14, 2007 than after.  But, as discussed, after the alleged incidents, Thomas demonstrated a significant ability to protect her own legal and practical interests.  Insofar as Thomas's functionality made her ineligible for the insanity toll on and after May 14, 2007, Dr. Teich's opinion that her illness and symptoms were less severe beforehand undermines her bid for the toll.

Thomas raises a number of other arguments.  None have merit.

First, Thomas argues that the probative value of her ability to perform ordinary life tasks while at the CREF unit is diminished because she relied on the "institution" and "routine" to perform these tasks.  Thomas Br. 14.  In so claiming, Thomas's brief misquotes Dr. Teich's supplemental report, and attributes to him ideas about a routine of simple behaviors in an institutional setting which he did not express.  *See* Teich Supp. Report at 3.  But even if Dr. Teich had drawn a distinction between Thomas's ability to function in regular society as opposed to inside the RPC, the *sine qua non* of eligibility for the insanity toll is an inability to protect one's legal interests.  The overwhelming evidence of Thomas's ability to protect her legal interests is decisive, eclipsing the nuances of her behavior within and without the RPC.

Second, Thomas argues that her efforts to seek relief in judicial or quasi-judicial fora were unsuccessful, and therefore do not bespeak a capacity to protect her interests.  Thomas Br. 16.  This argument factually overlooks Thomas's successful efforts to regain eligibility for food stamps, Joint 56.1 ¶¶ 45–47, and ignores that the governing test is not bottom-line success of an

18

administrative or legal claim—for which the merits may not justify relief—but the functional ability to bring it.

Third, and finally, Thomas argues that summary judgment should be denied because the defense expert stated that he could not, to a reasonable degree of medical certainty, reach a conclusion about Thomas's capacity on May 13, 2007, whereas Dr. Teich declared that Thomas lacked such capacity based on her history of behavior and protected environment. Thomas Br. 16. But Thomas, as plaintiff, bears the burden of proving the applicability of a toll. *Keitt*, 2010 WL 3466175, at *7; *Swartz*, 2000 WL 1448627, at *5. Defendant's expert's understandable reluctance to form a conclusion about Thomas's capacity on a particular day many years earlier does not create a question of fact as to that capacity when the assembled record evidence regarding the surrounding weeks and months amply demonstrate her ineligibility for the toll. And, for the reasons explained, Dr. Teich's opinion is insufficient to meet the demanding standards for an insanity toll.

In sum, the Court concludes that the record evidence demonstrates that Thomas had sufficient capacity at the time her claim accrued to protect her legal rights, and that her expert's opinion is insufficient to raise a question of fact as to her eligibility to toll the statute of limitations based on a claim of insanity under C.P.L.R. § 208. *See Smith*, 830 F.2d at 12 (affirming summary judgment); *Inesti*, 2013 WL 5677046 at *1, *5–6 (granting summary judgment); *Swartz*, 2000 WL 1448627, at *4, *7 (same).[16] Thomas's complaint was untimely, and because the insanity toll does not apply to her claim, Harris is entitled to summary judgment.

---

[16] The parties, at the Court's request, helpfully briefed the issue of whether factual questions related to the application of the insanity toll should be decided by the court or a jury. Because the Court here finds that there is no material dispute of fact on that point, the Court ultimately had no occasion to resolve the issue.

\*\*\*

In so ruling, the Court, while expressing no view as to the merits of Thomas's cause of action, regrets that Thomas will not have an opportunity to adjudicate it on the merits because of the tardiness of her filing. Thomas's failure to timely file this lawsuit is particularly regrettable because she took the early initiative to retain counsel in 2007 to pursue this claim. The record does not explain why Thomas's counsel, Frishberg, caused this lawsuit to be filed outside of the statute of limitations, requiring counsel to invoke an insanity toll in an attempt to salvage his client's claim. Certainly there is no evidence in the record of any impediment to an earlier filing. Nevertheless, even if the fault for the tardy filing properly lies with counsel,[17] the statute of limitations must be enforced.

## CONCLUSION

For the foregoing reasons, Harris's motion for summary judgment is granted. The Clerk of Court is respectfully directed to remove the case from the suspense calendar, terminate the motion pending at docket number 57, enter judgment for defendant, and close this case.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: September 6, 2016
       New York, New York

---

[17] This is not the first of plaintiff's counsel's clients whose claims were barred by the statute of limitations, and for which counsel unsuccessfully sought to have the statute of limitations tolled for a single day, on account of purported insanity, to excuse the late filing. *See Luciano v. City of New York*, 684 F. Supp. 2d 417 (S.D.N.Y. 2010).

20